This is a boundary action. Defendant owns Lot 98 of the Land Subdivision in the City of Shreveport. The plaintiffs, who are the surviving widow and the sole heir of B.A. Kobler, deceased, own a strip seven feet wide off of the west side of Lot 99 of the subdivision. They formerly owned the entirety of said Lot 99. The location of the common line between these lots is in dispute. Plaintiffs allege that defendant is asserting ownership of a strip 2.6 feet wide off of the west side of said 7-foot strip the entire depth of the lots, or 145 feet, and that her residence occupies a portion of said 2.6-foot strip.
H.E. Barnes, a civil engineer, was first appointed by the court to make a survey of and locate the boundary line in dispute. Thereafter on motion of the defendant, the court appointed George E. Dutton, a civil engineer, to also survey and locate the disputed line. Each engineer made a survey as directed and filed proces verbal thereof. They differed in their location of the embattled line. There was no motion filed to homologate either survey. Defendant answered and put at issue the contentions advanced by plaintiffs. The admitted testimony covers a wide range for a case of this character. Plaintiffs champion the Barnes survey while defendant stands upon that made by Dutton. The lower court sustained plaintiffs' contention and approved the Barnes survey. Defendant appealed.
In the year 1901 the several heirs of Mary E. Land, deceased, owned the west one-half (W. 1/2) of the southwest one-quarter (S.W. 1/4) of Section 6, Twp. 17 N., Range 13 W. The record does not disclose if the tract was then within the limits of the City of Shreveport. It was woodland. The heirs decided to subdivide the tract (excepting five acres) into town lots and constitute a subdivision. To effectuate this desire, they employed J.M. Williams, a reputable surveyor, to survey off and delineate the lots, alleys and streets of the subdivision. He did so and in conjunction therewith made up a plat of the subdivision on which the lots (365 in all), were numbered, streets named, measurements and bearings given.
The subdivision was named "Land Subdivision to the City of Shreveport". The plat was recorded on November 25, 1901 in Conveyance Book No. 28, Folio 462, of the Records of Caddo Parish. It does not appear that any proces verbal of the survey was made.
The subdivision is bounded as follows:
North by Olive Street; East by Creswell Street; South by Wilkinson Street, and *Page 56 
West by Line Avenue. Lots 98 and 99 each front on College Street (formerly Voorhies Street) 40 feet and extend back northerly between parallel lines 145 feet.
The west boundary of said west one-half (W. 1/2) of southwest one-quarter (S.W. 1/4) of Section 6 is the range line. College Street intersects Line Avenue at right angles. It is 60 feet wide between property lines.
When this subdivision was laid off, there was considerable uncertainty as to the exact location of the range line in the vicinity of said 80-acre tract. This uncertainty was not entirely removed until the year 1910.
The plat of the subdivision prepared by Williams discloses that in his effort to follow the range line (west boundary of the subdivision), he ran a line bearing south 89 degrees 45 minutes east from the center of the intersection of the avenue with Olive Street, being the northwest (N.W.) corner of said west one-half (W. 1/2) of southwest one-quarter (S.W. 1/4) of Section 6. A strip 30 feet wide on the east side of this line the entire length of the tract was set apart and dedicated as the east one-half of Line Avenue. The east side of this 30-foot strip is the west property line.
On February 27, 1911, John R. Land, one of the heirs of Mary E. Land, deceased, sold to B.A. Kobler, thirty-three (33) of the lots drawn by him in the partition of his mother's estate, including numbers 97, 98 and 99.
On March 1, 1922, plaintiffs herein sold to Maurice E. Phillips, Lots 97 and 98 of the Land Subdivision and on May 20, 1922, Phillips conveyed to the United States Fidelity Guaranty Company these two lots and other lots in said subdivision with buildings and improvements thereon, and other property. On June 14, 1923, the United States Fidelity Guaranty Company conveyed to Mrs. Koch, the defendant, Lot 98 of the Land Subdivision. In each of these deeds, save the one from Phillips to the United States Fidelity Guaranty Company, specific reference is made to the map of the Williams survey recorded in Conveyance Book 28, page 462 of the Records of Caddo Parish, for identification purposes.
Therefore, it is seen that plaintiffs and defendant trace their titles to a common author and acquired their respective properties under and with reference to the Williams map, as recorded.
A time was set by the surveyors to repair to the locus and make a joint survey. Mr. Dutton preceded Mr. Barnes to the place. The litigants or their respective counsel were present and produced their title papers. Dutton then began a survey in keeping therewith which meant that the lines as run by Williams and as shown on the map, would be retraced by him. Barnes arrived soon thereafter and on learning how Dutton proposed to make the survey, withdrew, giving notice that in the afternoon he would return and make a survey independent of that which Dutton was making. After Dutton had completed his survey, he marked the boundary line in keeping therewith. According to his survey no part of defendant's residence is on plaintiffs' land. There is a slight overhang of the eaves.
Dutton began his survey at what is known as the Land monument, which marks the center of the intersection of Line Avenue and Olive Street. It is the northwest (N.W.) corner of the said west one-half (W. 1/2) of southwest one-quarter (S.W. 1/4) of Section 6, a well recognized and established corner. From this point he ran south 89 degrees 45 minutes east, 739 feet along the old line as run by Williams, to the center of College Street. Thence he ran at an angle of 90 degrees 15 minutes to left along the center line of College Street 470 feet (the frontage of 11 lots, plus 30 feet allowed for Line Avenue), and set a point. This point is 30 feet south of the south corner common to lots 98 and 99. He then measured 30 feet (on angle of 90 degrees, 15 minutes left) and set an iron stake to mark said common corner, and continued on same bearing 145 feet along common line to north common corner on alley.
Barnes returned to the scene in the afternoon and made a survey. He also began at the Land monument corner but ran south 00 degrees, 2 minutes east which bearing is 13 minutes farther west than the bearing used by Dutton. When Barnes had run 739 feet to the center of College Street he was 3.6 feet farther west than was Dutton. This difference, of course, is due to the divergence of the two lines from the Land monument corner. The south common corner of the lots as established by Barnes, is 3.6 feet farther west than that fixed by Dutton. At the rear of the lots the difference is 3 feet even. According to *Page 57 
Barnes' survey, defendant's residence is over the line 2.65 feet. He did not follow the unambiguous description in the title deeds of both litigants. Had he done this rather than adopt new bearings, there would be no variance between his survey and that of Dutton.
We attach a small plat of the locus with varying lines which will be of assistance to any one desiring to acquaint himself with the facts.

Defendant's residence was erected in 1921, some two years prior to her acquisition of the lot. Admittedly, it was constructed with reference to the Williams survey and plat. She has held continuous physical possession of the property since purchasing it.
Mr. J.F. Utz, brother of Mrs. Kobler, looked after her real estate business following the death of Mr. Kobler. Neither he nor plaintiffs suspected that Mrs. Koch's improvements were over her line until November, 1939. At that time plaintiffs were negotiating a sale of Lot 99. The prospective purchaser desired to know its limits. Mr. Barnes was employed to establish the boundary lines. His survey then was identical with that made by him in the present suit.
Mrs. Koch testified that when she purchased Lot 98 there were in existence *Page 58 
stakes to indicate its limits and that she possessed with reference to them.
Mr. Barnes is certain that the correct range line bearing from the Land monument is south 00 degrees, 2 minutes east. He described and located two established and generally recognized corners on the range line north of this monument and testified that the bearing south of it should be the same as that north of it; that such bearing corresponds very well with the original governmental survey. We are disposed to think him correct on this phase of the matter. The evidence in the case seems to support that position. If the monuments north of the Land monument are correctly located, the range line south of them is simply a prolongation of the line which connects them. There is no kink in the range line.
But granting that the Williams line from the Land monument south was run on a slightly erroneous bearing, can this fact affect persons who have purchased lots on the faith of the public records and the map, and who have possessed and improved such lots in keeping therewith? We do not think so.
Mr. Barnes admits that defendant's improvements do not encroach upon plaintiffs' property according to the Williams survey on the ground, but contends that the survey on the ground does not agree with the recorded map of the subdivision. He gave the following testimony on this feature of the controversy, to-wit:
"Q. One more question, Mr. Barnes. Your testimony then, finally, is that the plat is correct as recorded in the Conveyance Book, but that the survey as made by Williams is incorrect? Is that your testimony? A. It is, with this qualification. I have never been able to positively identify the Williams survey on the ground, but I believe, from what evidence we do have in our re-survey of that subdivision in 1915 and prior surveys, that Williams did make his survey on the ground as I have testified; agreeing with the present line at the northwest corner and varying to the extent of about thirteen feet (13') at the south end of the subdivision."
We are unable to perceive wherein the map is in disagreement with the survey on the ground. Had Williams run south 00 degrees, 2 minutes east from the Land monument corner, then there would be disagreement between the map and his survey on the ground, but since he ran from this corner south 89 degrees, 45 minutes east and based all subsequent delineations and measurements concerning the subdivision upon this line, it seems to us there is complete harmony between the map and the survey on the ground. Evidently Williams believed he was running the true range line. At that time this line had not been established as was consequently done, and the fact that he may have missed it slightly, yet stayed on the Land property, at this date, certainly cannot unfavorably affect persons who have acquired and now hold property in keeping with his official action as reflected from the map.
Williams allowed the 30-foot strip east of his north and south line for public use, as part of the avenue, and laid off lots for one-half mile north and south with respect thereto. The heirs dedicated this strip along with other streets and alleys of the subdivision to public use. These acts fixed a status which was relied upon by subsequent purchasers of the lots and cannot be altered to their prejudice.
Mr. Barnes testified that he had made seventy-six (76) different surveys in the Land Subdivision and that in each instance he pursued the methods employed by him in this case. This is doubtless true, and if the owners were satisfied to abide by such surveys and possessed accordingly without injury to or objection from adjacent owners, they were within their rights to do so. However, Dutton made a check to ascertain if there were other lots in the vicinity of defendant's, the improvements whereon and possession of which, corresponded to the Williams survey. On the subject, he says:
"* * * In order to satisfy myself that the boundary so fixed coincides with the old lines laid down by the original surveyors platting this Land Subdivision, I measured East along the alley from Line Avenue in the rear of Lots 87 and 88 and find old occupations that check namely between Lots 82 and 81, 81 and 80, 80 and 79, 76 and 75, 88 and 89; An old fence in Lot 90, and a hedge between 96 and 97; also along alley in rear of Lots 145 and 146; an old fence on Lot 144, a fence between 140 and 139, 139 and 138, and 138 and 137. These old property lines are in the near vicinity of lots surveyed."
If the survey of Mr. Barnes should be approved as controlling of the issues in this case, the ultimate effect of such would be a total correction of the Williams survey by shoving westerly the entire subdivision. *Page 59 
He was not directed by the court to make a new survey nor to correct an old one.
Surveys of real estate when once made and acted upon in good faith may not be altered ex parte to the prejudice of persons who have acquired in keeping with the locations, measurements, bearings and descriptions thereof. Rights so acquired become vested and are protected by statutory and constitutional guarantees. Even the United States government is powerless by a new survey to alter or unfavorably affect rights acquired under an earlier survey made by its authority. An early, yet leading case on the question is Cragin v. Powell et al. 128 U.S. 691, 693, 9 S.Ct. 203, 32 L.Ed. 566. It was held therein:
"The courts have power to protect the private rights of a party who has purchased lands in good faith from the government against the interferences or appropriations of corrective resurveys, made by the Land Department, subsequent to such purchase."
This case has been uniformly followed by all courts, including our own, so far as our investigation revealed.
In Werk v. Leland University, 155 La. 971-975, 99 So. 716, 717, concerning maps and plats referred to in and made part of a transfer of real estate, it is said:
"The annexing of the map to the deed, and the reference to it in the description given in the deed, made the map as important a part of the description as if it had been actually copied in the deed. Canal Bank v. Copeland, 6 La. 543, 544; Keay v. New Orleans Canal Banking Co., 7 La.Ann. 259; Lallande v. Wentz 
Pochelu, 18 La.Ann. 289, 290; Gray v. Coco, 113 La. 33, 36 So. 878; Nick v. Bautovich, 119 La. 1039, 44 So. 880."
To support this holding, the court, with approval, quoted the following excerpt from Cragin v. Powell, supra, to-wit:
"`It is a well-settled principle that when lands are granted according to an official plat of the survey of such lands, the plat itself, with all its notes, lines, descriptions and landmarks, becomes as much a part of the grant or deed by which they are conveyed, and controls so far as limits are concerned, as if such descriptive features were written out upon the face of the deed or the grant itself.'"
See, also, City of New Orleans v. Ruffin B. Paine, Deputy United States Surveyor, 147 U.S. 261, 13 S.Ct. 303, 37 L.Ed. 162.
To same effect is Theriot v. Caffery et al., 160 La. 72,106 So. 698. 8 Am.Juris., Page 750, paragraph 8, cogently summarizes the pertinent law in the following language:
"Where land is conveyed according to a plan, the courses, distances, and boundary lines delineated on it are to be regarded in legal construction as the description by which the limits of the grant may be ascertained; and whenever a deed describes property by reference to a plat or map, the grantor is considered as having adopted the plat or map as a part of the deed, and the grantee takes title in accordance with the boundaries so identified, which are conclusive upon the parties until a reformation of the deed is secured. Where the plat is referred to only for the purpose of boundary, the fact that it had been illegally laid out and platted into lots and streets does not in anywise affect the deed."
Defendant filed pleas of prescription and estoppel in the lower court and renewed them in this court. The decision reached by us obviates passing on these pleas.
It is our conclusion, after a careful study of the record, and pertinent jurisprudence, that the correct boundary line between the property of the parties to this suit is that which was located and run by the engineer, Dutton, admittedly in keeping with the Williams survey.
For the reasons herein assigned, the judgment appealed from is reversed, annulled and set aside, and there is now judgment in favor of the defendant, Mrs. Hazel Drew Koch, and against the plaintiffs, Mrs. Belmore U. Kobler and Mrs. Elizabeth Kobler Hicks, approving and homologating the proces verbal of George E. Dutton, surveyor, appointed herein by the court, and the sketch thereto annexed; and ordering that the boundary line between the respective properties of plaintiffs and defendant, namely, the line between Lots 98 and 99 of Land Subdivision of the City of Shreveport, Louisiana, as per map of said subdivision recorded in Conveyance Book No. 28, Page 462 of the Records of Caddo Parish, be fixed in accordance with the said proces verbal and sketch of the said Dutton, filed in the record of this case, which proces verbal and sketch or plat of survey are hereby made a part of this judgment.
It is further ordered, adjudged and decreed that the proces verbal and plat of *Page 60 
survey of H.E. Barnes, be and the same are hereby rejected.
It is further ordered, adjudged and decreed that cost of this suit, including the fees of the surveyors as fixed by the lower court, be and the same are hereby assessed against plaintiffs.
 On Rehearing.